UNITED STATES of America,
Plaintiff–Appellant,

v.

Oraldo TRETO–HARO, Defendant–
Appellee.

No. 01–1146.

United States Court of Appeals,
Tenth Circuit.

April 24, 2002.

James C. Murphy, Assistant United States Attorney (John W. Suthers, United States Attorney, and H. Wayne Campbell, Assistant United States Attorney, with him on the briefs), Denver, CO, for Plaintiff–Appellant.

Stacey L. Ross, Springer and Steinberg, P.C., Denver, CO, for Defendant–Appellee.

Before LUCERO, ANDERSON, and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

A federal grand jury indicted Defendant Oraldo Treto–Haro, a/k/a Carlos Gonzales, on one count of possession with intent to distribute five or more kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(A). Defendant moved to suppress statements he made to federal agents and contraband seized from his residence purportedly obtained in violation of the Fourth Amendment. Following a hearing, the district court held that reasonable suspicion supported the initial stop of Defendant's person, but that a federal agent exceeded the lawful scope of a pat down search for weapons when the agent reached into Defendant's pants pocket and retrieved a folded piece of paper containing cocaine. As a result of that find, the agent arrested Defendant. The court reasoned that "[w]hat was a legitimate *Terry* stop escalated to an arrest without probable cause." *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Because Defendant's arrest was unlawful, the court suppressed as fruits of that unlawful arrest all statements he made and evidence agent's seized subsequent to the pat down search and arrest of Defendant.

The Government filed a motion to reconsider, suggesting for the first time that because Defendant admitted he was an illegal alien prior to the agent's pat down search, an independent basis provided the agent probable cause to arrest Defendant. The court denied the motion as having "no merit," and the Government appealed. Our jurisdiction arises under 18 U.S.C. § 3731. On appeal, Defendant challenges the validity of the initial stop, while the Government challenges the inval-

idity of the subsequent arrest. In considering these challenges, we consider the evidence in a light most favorable to the district court's legal determinations, and review the court's findings of historical fact for clear error. *United States v. Williams,* 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1610, —— L.Ed.2d —— (2002). Absent any finding of fact, we will uphold the court's legal determination if any reasonable view of the evidence supports it. *United States v. Gonzales,* 897 F.2d 504, 506 (10th Cir.1990). We review the ultimate determinations of reasonable suspicion to stop and probable cause to arrest de novo. *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Applying these standards, we reverse.[1]

## I.

At the suppression hearing, the Government presented the testimony of Drug Enforcement Administration (DEA) Agent Jason Diaz and Immigration and Naturalization Service (INS) Agent Michael Riebau. The record reveals that prior to Defendant's arrest on July 26, 2000, Agents Diaz and Riebau, together with DEA Agent Tom Bartusiak, obtained information from a reliable confidential informant regarding Defendant. According to the informant, a Mexican national by the name of Carlos Gonzales was a DEA fugitive from Utah and was suspected of stashing a large quantity of drugs at his residence. Gonzales reportedly lived outside Keenesburg, Colorado, a small rural community northeast of Denver. The agents subsequently located Gonzales' ap-

---

**1.** As a preliminary matter, Defendant argues we lack jurisdiction over this appeal due to the Government's failure to identify this Court in its notice of appeal. Fed. R.App. P. 3(c)(1)(C) plainly provides that a "notice of appeal must . . . name the court to which the appeal is taken." Nevertheless, in *Graves v. General Ins. Corp.,* 381 F.2d 517 (10th Cir. 1967), we held the improper designation of this Court in a notice of appeal as the Supreme Court of New Mexico rather than the United States Court of Appeals for the Tenth Circuit did not warrant dismissal of the appeal. Lest we become a citadel of technicality, we reasoned that "a defective notice of appeal should not warrant dismissal for want of jurisdiction where the intention to appeal to a certain court of appeals may be reasonably inferred from the notice, and where the defect has not materially misled the appellee." *Id.* at 519; *accord United States v. Neal,* 774 F.2d 1022, 1023 (10th Cir.1985). In this case, the notice of appeal correctly shows the United States District Court for the District of Colorado as the court from which the Government takes this appeal. At this stage, the United States Court of Appeals for the Tenth Circuit is the only Court to which the Government may take this appeal. The Government's failure to identify this Court in its notice of appeal, while careless if not inexcus-

able, did not prejudice or mislead Defendant. Accordingly, we conclude the Government's notice of appeal is sufficient to provide us with jurisdiction. *See Dillon v. United States,* 184 F.3d 556, 557–558 (6th Cir.1999) (en banc) (holding that "where only one avenue of appeal exists, Rule 3(c)(1)(C) is satisfied even if the notice of appeal does not name the appellate court"); *compare Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 313–18, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988) (holding that the court of appeals lacked jurisdiction over a party not specified in the notice of appeal as required by Fed. R.App. P. 3(c)(1)(A); specifically, appellant's use of "et al." in the notice of appeal was insufficient to notify defendant or the court that intervenor-plaintiff, one of sixteen intervenors, was an appellant, or to allow them to determine whether he was bound by the adverse judgment), *with Smith v. Barry,* 502 U.S. 244, 245–50, 112 S.Ct. 678, 116 L.Ed.2d 678 (1992) (holding that a document intended to serve as an appellate brief may constitute the "functional equivalent" of a notice of appeal sufficient to satisfy the requirements of Fed. R.App. P. 3, because the purpose of Rule 3's requirements "is to ensure that the filing provides sufficient notice to other parties and the courts").

parent residence at 27867 Weld County Road 18. The agents believed a van associated with the residence belonged to Gonzales.

On the afternoon of July 26, 2000, the three agents, together with Denver County Detectives Ray Ayon and Ron Mayoral, established surveillance of the residence. A while later, the agents observed the van leave the residence and travel to a gas station in Keenesburg. After a brief encounter between the driver of the van and another individual, the van departed followed by a Saturn sedan containing four occupants. Shortly thereafter, both vehicles arrived at the residence. After another brief encounter between the vehicles' occupants, the sedan departed the residence around 7:00 p.m. Agents Riebau and Bartusiak followed the sedan away from Keenesburg.[2]

Meanwhile, Agent Diaz observed the van leave the residence and proceed towards Keenesburg. Agent Diaz, with Detectives Ayon and Mayoral, followed the van. The van pulled into the County Liquor Store near Keenesburg. At around 7:20 p.m., an individual exited the van and proceeded into the liquor store. When the individual exited the store, Agent Diaz, wearing a law enforcement badge in plain view, approached him and said: "Carlos." The individual looked at Agent Diaz as if to acknowledge him. Diaz identified himself and asked the individual his name. The individual stated his name was Carlos Gonzales and produced an apparently valid driver's license with that name.

Agent Diaz advised Agents Riebau and Bartusiak, with whom he was in radio contact, that he had contacted a suspect known as Carlos Gonzales. Agent Riebau told Diaz to inquire into the suspect's immigration status and detain him so that Riebau could verify that status.[3] The suspect initially stated he was in the country legally. When Agent Diaz informed him that INS Agent Riebau soon would arrive to verify his immigration status, however, the suspect acknowledged his illegal status. At that point, Agent Diaz asked the suspect to place his hands on the hood of the van as a safety precaution. During a pat down frisk for weapons, Agent Diaz located a folded piece of paper, or a "bindle," sticking out of the suspect's pants pocket. His suspicion aroused, Agent Diaz removed the bindle and opened it. Inside Agent Diaz found a white powdery substance which he believed to be cocaine.[4] Agent Diaz arrested Defendant and transported him back to his residence. Agents Riebau and Bartusiak were waiting at the

---

2. Agents Riebau and Bartusiak subsequently stopped the sedan and uncovered a quarter kilogram of cocaine on one of the vehicle's occupants. This information, however, was unknown to Agent Diaz at the time he arrested Defendant.

3. Federal law authorizes an INS agent "without warrant ... to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1).

4. Although the sequence of events was somewhat unclear from Agent Diaz' initial testimony, the court and defense counsel clarified the sequence:

*The Court:* He [Defendant] told you he wasn't here legally at the time before you removed the bindle from his pocket? Is that what you're saying?
*The Witness:* That's correct. He stated his name was Carlos Gonzales, and he had also retracted the statement that he was here legally after I had spoken to him about Agent Riebau.
*The Court:* Okay. Go ahead, Mr Steinberg [Defense Counsel].
*By Mr. Steinberg:*
Q. So I'm clear, you're now saying that the pat-down search occurred after he told you he was here illegally?
A. Yes, sir.
Aplt's App. Vol 2, at 70–71.

residence. Shortly after arriving, Agent Diaz read Defendant his Miranda rights. Defendant indicated he understood his rights and consented to a search of his residence. When asked if he had drugs, money, or weapons inside the residence, Defendant responded "I've got a lot of stuff." With Defendant's assistance, the agents located large quantities of marijuana, cocaine, and weapons inside Defendant's residence.

## II.

At the outset, Defendant asserts reasonable suspicion did not support Agent Diaz' initial stop of his person. According to Defendant, the knowledge Agent Diaz possessed at the time of the stop, derived solely from the confidential informant and surveillance of the residence, was insufficient to support a reasonable suspicion of criminal activity. The district court disagreed, concluding that "sufficient circumstances" existed to justify Agent Diaz' initial stop of Defendant. We accept the district court's implicit conclusion that the information on which Agent Diaz relied to stop Defendant was sufficient to establish reasonable suspicion.

 In *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court established that a police officer "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to arrest." In other words, "[a] brief stop of a suspicious individual in or-

der to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Accordingly, an investigatory stop or detention of a person need only be supported by a reasonable suspicion of criminal activity. *United States v. Hishaw*, 235 F.3d 565, 569 (10th Cir.2000), *cert. denied*, 533 U.S. 908, 121 S.Ct. 2254, 150 L.Ed.2d 241 (2001). Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir.2001). In *United States v. Tuter*, 240 F.3d 1292, 1296 n. 2 (10th Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 195, 151 L.Ed.2d 137 (2001), we recently explained the distinction between reasonable suspicion and probable cause.

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

In this case, the record indicates that a reliable informant told Agent Bartusiak that a Mexican national using the alias Carlos Gonzales was a fugitive from Utah.[5] The informant did not say whether Gonzales was in the country legally. Accord-

---

**5.** At the hearing, Agent Riebau established the informant's credibility.

> *Q.* Okay. Now do you have personal knowledge of the identity of this informant?
> *A.* Yes, I do.
> *Q* Okay. And do you know whether or not this informant has given information to local law enforcement authorities in the past?

> *A.* Yes, I do.
> *Q.* And do you know whether or not the information given by this confidential informant in the past in the Denver metropolitan area has been true and correct, or has it been false?
> *A.* It's been very accurate.
> Aplt's App. Vol 2, at 106–07.

ing to the informant, Gonzales had a large quantity of drugs at his residence near Keensburg, Colorado. Agent Bartusiak conveyed this information to Agents Diaz and Riebau along with information regarding the suspect's possible place of residence. During their subsequent surveillance, the agents witnessed two very brief, suspicious encounters between an unidentified sedan and a van believed to be associated with the suspect. Agent Riebau testified that although he could not "see any pass-off of drugs," his training and experience led him to suspect a drug transaction.[6] Agent Riebau informed Agent Diaz of his suspicion. The agents decided to attempt to contact the occupants of these vehicles in their search for "Carlos Gonzales." When Agent Diaz subsequently approached the driver of the van coming out of the liquor store and said "Carlos," Defendant acknowledged the agent.

Agent Diaz at this point was justified on the basis of his own knowledge in approaching and briefly detaining Defendant to request his driver's license.[7] The information obtained from both the confidential informant and surveillance of Defendant's residence carried more than enough indicia of reliability to justify Agent Diaz' initial stop of Defendant. *See Adams*, 407 U.S. at 146–47, 92 S.Ct. 1921 (unverified tip from reliable informant known personally to the officer alone sufficient to establish reasonable suspicion for stop). Defendant's assertion that the informant lacked reliability is contrary to the record evidence and the district court's implicit finding that the informant was reliable. Defendant gives us no reason to question Agent Riebau's testimony that the informant, who the agent personally knew, had provided "very accurate" information in the past and was reliable. *See United States v. Gonzales*, 897 F.2d 504, 505–07 (10th Cir. 1990) (unverified tip from reportedly reliable informant "based on hearsay or even double hearsay" sufficient to establish reasonable suspicion for stop); *compare Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (noting that a known informant, whose reputation can be assessed, may be held responsible if the information turns out to be fabricated).

■ The information Agent Diaz obtained from Agent Riebau's surveillance of Defendant's residence adds further support to the district court's finding of reasonable suspicion. Defendant claims Agent Diaz' suspicion that a drug transaction had occurred outside of his residence is "pure speculation." Admittedly, the agents observing the encounter between

---

**6.** Agent Riebau responded to the court:

> *The Court:* I have just one question. What did you personally see and/or observe that led you to believe there had been a pass-off of drugs between the van and the Saturn?
>
> . . . . .
>
> *The Witness:* I saw the person come out of the van, who is later identified, at least in my judgment, as the defendant. The two [sic] people were in the Saturn. They stayed in the vehicle. And this defendant went over and was talking with people. And I don't recall which side of the vehicle; but he was leaning in, talking to them, and than all of a sudden, he walked away from

the vehicle and the Saturn departed the area. And it was a very short period there. Aplt's App. Vol. 2, at 121.

**7.** Not all interaction between a law enforcement officer and a criminal suspect constitutes a "seizure" of the suspect. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a[n] [individual] may we conclude that a "seizure" has occurred." *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868. Because reasonable suspicion to support a brief stop existed at the outset of Agent Diaz' encounter with Defendant, we *assume* that a seizure of Defendant occurred when Agent Diaz initiated contact with Defendant.

the sedan and van outside the residence did not actually witness Defendant distributing drugs. As we have repeatedly stated, however, " 'even ambiguous behavior, susceptible to an innocent interpretation, may give rise to a reasonable suspicion of criminality depending on the totality of the circumstances.' " *Hishaw*, 235 F.3d at 569–70 (rejecting Defendant's argument that "no officer ever observed him engaged in any illegal activity during the many hours of surveillance.") (quoting *Oliver v. Woods*, 209 F.3d 1179, 1188 (10th Cir. 2000)). In this case, the totality of the circumstances provided sufficient justification for Agent Diaz' stop of Defendant.

### III.

██ The district court ultimately granted Defendant's motion to suppress because, in the court's view, Agent Diaz exceeded the lawful scope of a pat down search for weapons when the agent located and retrieved from Defendant's pants pocket the "bindle" containing cocaine. The district court concluded Defendant's arrest, based on that illegal find, was without probable cause. The Government argues, however, that the search and arrest were necessarily lawful because probable cause to arrest Defendant arose prior to the search when Defendant admitted he was in the country illegally. We agree with the Government and thus need not decide whether the search, absent Defendant's admission, was lawful. Because the record plainly indicates that probable cause to arrest Defendant arose prior to the initial search of Defendant, the district court improperly granted Defendant's motion to suppress on the premise that Agent Diaz arrested Defendant without probable cause.

██ Apparently, Agent Diaz' subjective belief was that probable cause to arrest Defendant arose from his discovery of the cocaine. Yet, as we recently explained in *United States v. Santana–Garcia*, 264 F.3d 1188, 1192 (10th Cir.2001), a law enforcement officer's subjective belief as to the existence of probable cause to arrest is not determinative of the lawfulness of the arrest.

> We measure probable cause against an objective standard and evaluate it in relation to the circumstances as they would appear to a prudent, cautious and trained police officer. The subjective belief of an individual officer as to whether probable cause existed for detaining a criminal suspect is not dispositive. That an officer did not believe probable cause existed to detain a suspect does not preclude the Government from justifying the suspect's detention by establishing probable cause.

(internal citations omitted).

In *Santana–Garcia*, 264 F.3d at 1193, we held that a Utah State Trooper, "regardless of his subjective belief that he had no authority to arrest Defendants, had probable cause to arrest both Defendants for suspected violation of federal immigration law" at the time they admitted they were in the country illegally.[8] Similarly, in this case Agent Diaz had probable cause to arrest Defendant at the time he admitted his illegal status. Because that admission occurred prior to Agent Diaz' pat down search of Defendant, the district court should have denied Defendant's motion to suppress.

REVERSED and REMANDED.

---

**8.** Like the Government here, the Government in *Santana–Garcia* did not raise the "illegal status" argument until a motion to reconsider, which we noted then, and note now, is much too late for effective advocacy. *See Santana–Garcia*, 264 F.3d at 1192 n. 5.